## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## HARTFORD DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| ANDREW LONGO, JR., | ) | Case No. 21-20909 (JJT) |
| Debtor. | ) | |
| | ) | |
| ANDREW LONGO, JR., | ) | |
| Plaintiff, | ) | Adv. Pro. Case No. 22-02012 (JJT) |
| | ) | |
| v. | ) | |
| | ) | RE: ECF No. 37 |
| DISCOVER BANK, | ) | |
| Defendant. | ) | |
| | ) | |

### MEMORANDUM OF DECISION ON PLAINTIFF'S SECOND REQUEST FOR DEFAULT JUDGMENT REGARDING DISCHARGE OF STUDENT LOANS

Before the Court is a Request for Default Judgment (AP-ECF No. 37, the "Request")[1] filed by the Debtor/Plaintiff, Andrew Longo, Jr. (the "Debtor"), who seeks to have the Court enter a default judgment on the Debtor's Amended Complaint (AP-ECF No. 33) against the sole, non-appearing Defendant, Discover Bank ("Discover"). The Complaint sets forth a single count for discharge of student loans under 11 U.S.C. § 523(a)(8) based on a claim of undue hardship. The Debtor's claim implicates the Second Circuit's *Brunner* test for discharge of student loans. *See Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir. 1987). The Debtor alleges that the repayment of his private student loans, with a total balance of $127,910.26, would constitute an undue hardship. Compl. ¶¶ 1, 9. To date, Discover has neither filed an appearance or answer nor has it moved to set aside the Clerk's Entry of Default (AP-

---

[1] All references to the docket of the Debtor's main bankruptcy case are designated as "BR-ECF No. ___." All references to the docket of the Debtor's adversary proceeding are designated as "AP-ECF No. ___."

ECF Nos. 8, 57) or challenged the Debtor's Request, despite proper service of those docket entries to Discover.

For the following reasons, and after full consideration of the Debtor's facts and circumstances, the relevant legal arguments, and the record of this case, the Court finds that payment of the entire private student loan debt would impose an undue hardship on the Debtor. As further explained below, the Court will grant the Debtor a partial discharge of his private student loan debt. Accordingly, after consideration of the Debtor's testimony during a hearing and reviewing documentary evidence, the Court grants, in part, the Debtor's Request for a Default Judgment.

## I.    JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over the instant proceedings under 28 U.S.C. § 1334(b), and the Bankruptcy Court derives its authority to hear and determine this matter on reference from the District Court under 28 U.S.C. § 157(a) and (b)(1) and the General Order of Reference of the United States District Court for the District of Connecticut dated September 21, 1984. This matter is a core proceeding under 28 U.S.C. §§ 157(b)(2)(I) concerning the administration of the bankruptcy estate.

## II.    BACKGROUND

### A.  Procedural History

On September 30, 2021, the Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code.[2] In his Summary of Assets and Liabilities, the Debtor reported total assets of $41,916.29 and total liabilities of $168,314.78.  Of the Debtor's liabilities, a total of $146,330.63 consists of federal and private student loan debt. The Debtor owes $18,420.37 in

---

[2] All references to the Bankruptcy Code refer to Title 11 of the United States Code.

federal student loans and $127,910.26 in private student loans.[3] However, Discover never filed a proof of claim or otherwise appeared or participated in the Debtor's bankruptcy case. On November 9, 2021, the Chapter 7 Trustee entered a Report of No Distribution (BR-ECF No. 9) certifying that there was no property available for distribution from the estate and that the case had been fully administered. The Debtor received a discharge on January 12, 2022 (BR-ECF No. 12) and the Clerk's Office closed the case on January 27, 2022 (BR-ECF No. 15). The Debtor's student loans were excepted from his discharge as nondischargeable debts. On July 12, 2022, the Debtor moved to reopen the case (BR-ECF No. 20), stating he intended to challenge the non-dischargeability of his student loans under 11 U.S.C. § 523(a)(8). The Court granted the motion by order dated July 21, 2022 (BR-ECF No. 21).

On August 2, 2022, the Debtor commenced this Adversary Proceeding by way of Summons and Complaint against Discover (AP-ECF No. 3) by sending a copy via certified mail to Discover's main branch address.[4] On September 9, 2022, after Discover failed to appear, plead, or otherwise defend the case, the Clerk filed an Entry of Default against Discover (AP-ECF No. 8), which was also served on Discover at its main branch address. On September 12, 2022, the Debtor filed his first Request for Default Judgment (AP-ECF No. 10, the "First Request"). On December 15, 2022, the Court held a status conference where Discover failed to appear again.[5]

The Court denied the Debtor's First Request for a default judgment on the original Complaint because the Complaint lacked any detailed factual allegations that would demonstrate

---

[3] Payments on the Debtor's federal student loan are currently paused until September 2023 under President Biden's COVID-19 student loan debt relief program.
[4] Rule 7004(h) of the Federal Rules of Bankruptcy Procedure provides that service on an insured depository institution such as Discover Bank in an adversary proceeding shall be made by certified mail unless the institution is represented by counsel, the court orders otherwise, or the institution has waived its entitlement to service by certified mail in writing by designating an officer to receive service. Fed. R. Bankr. P. 7004(h).
[5] Notice of the status conference was also sent to Discover through the Court's Bankruptcy Noticing Center.

the Debtor's undue hardship under 11 U.S.C. § 523(a)(8) and the *Brunner* test and thus failed to state a claim upon which relief could be granted. *See* Ruling on Plaintiff's Request for Default Judgment (AP-ECF No. 31, the "First Default Judgment Ruling"). The Debtor subsequently amended his Complaint to add more particular allegations and filed the instant Request, both of which were served on Discover. Upon review of the Amended Complaint (AP-ECF No. 33), the Court chose to exercise its discretion under Fed. R. Civ. P. 55(b)(2) to conduct an evidentiary hearing to establish the truth of the Debtor's allegations and ordered the Debtor to submit evidence in support of his claim (AP-ECF No. 38). The Court's concerns were that the Debtor had not shown: (i) the amount, date, and loan number of each private student loan, (ii) that Discover was the current holder or servicer of these private student loans, and (iii) whether the loans had been refinanced or consolidated.

The Debtor filed exhibits in advance of the evidentiary hearing (AP-ECF No. 45), which included the following: (i) a copy of a state court complaint that Discover had intended to serve on the Debtor and file in the Connecticut Superior Court as a collections action against the Debtor regarding his private student loan debt (the "Collections Complaint"); (ii) a copy of the Debtor's Federal Student Aid Report; (iii) federal tax returns for the tax years 2016 through 2022, (iv) paystubs from his current employment; and (v) a recent statement and payment history for his auto insurance. On April 22, 2023, the Court conducted an evidentiary hearing where the Debtor had the opportunity to present this evidence and give his own testimony. By supplemental order dated April 14, 2023, the Court required the Debtor to file copies of all relevant promissory notes and related loan documents, as well as any documents evidencing any prior consolidation or refinancing of those loans (AP-ECF No. 50).

On April 17, 2023, the Debtor filed additional exhibits (AP-ECF No. 51) in compliance with the Court's order, which included: (i) promissory notes for two private student loans with Discover; (ii) a letter dated January 19, 2022 from Discover to the Debtor's bankruptcy attorney, Eugene S. Melchionne; and (iii) a screenshot of the Debtor's total account balance for both of his private student loans with Discover. On May 2, 2023, the Court held a second evidentiary hearing to address the Debtor's additional exhibits and allow the Debtor an opportunity to present arguments on the application of the *Brunner* test. At the conclusion of the hearing, the Court took the matter under advisement.

### B.  Factual Background

The Court derives the factual background from the Debtor's Amended Complaint, as well as the documentary evidence and testimony presented by the Debtor. All factual allegations in the Debtor's Amended Complaint were deemed admitted by virtue of the Clerk's Entry of Default (AP-ECF No. 57).

### 1.  The Debtor's Education and Professional Background

The Debtor attended Montville Highschool in Montville, Connecticut where he grew up. In 2009, the Debtor enrolled at Berklee College of Music ("Berklee") in Boston, Massachusetts to pursue his undergraduate degree in music. The Debtor made an agreement with certain family members where he would pay for two years of his degree, his mother would pay for one year, and his grandmother would pay for the remaining year. The Debtor's mother took out a loan in her name for approximately $53,000 to pay for one year of the Debtor's degree. To cover his portion of the agreement, the Debtor borrowed a combination of federal and private student loans. He borrowed approximately $18,000 in federal student loans.[6] In 2011, the Debtor

---

[6] The total outstanding principal amount of the Debtor's federal loans was $18,420.37 as of July 23, 2021. The original principal amount is unknown. The Debtor is not seeking a discharge of these loans and remains on an

borrowed $45,000 in private student loans from Discover ("Loan 1").[7] In 2012, the Debtor borrowed an additional $50,000 in private student loans from Discover ("Loan 2," and together with Loan 1, the "Discover Loans").[8] His mother, Lisa Longo, is a cosigner on both Discover Loans. In 2013, the Debtor graduated from Berklee and received his Bachelor of Arts in music.

With this degree, the Debtor expected that he would write music for movies and television commercials. After graduation, however, the Debtor realized that most jobs of this type existed in New York or California. He claims that Berklee did not inform him of this reality until near the end of his degree program. Most of the Debtor's peers who graduated from Berklee do not work in the music industry. One friend is a "jazzercise" instructor and another plays music on the side. He was required to take some general credits at Berklee but, as a music school, Berklee did not require him to focus on math and science. He believes his GPA was around 3.6 but claimed that Berklee did not focus heavily on counting grades. The Debtor has contemplated moving to New York or California at various times to look for jobs in the television and music industry, but never fully committed to the idea because he felt the cost of living was too high in those states.

After graduation, the Debtor benefitted from a six-month grace period on his Discover Loans before his monthly payments commenced at around $700 per month. He remembers making those payments for approximately one year but resorted to forbearance assistance at one point because he was barely able to make the payments. The Discover Loans came with a variable interest rate but provided a lower monthly payment for the first year.[9] In 2015, the

---

Income Based Repayment plan that he claims is affordable under his current budget. Payments on his federal loans were temporarily frozen under the COVID-19 federal student loan pause.
[7] Loan 1 bears loan number 0123.
[8] Loan 2 bears loan number 0125.
[9] The promissory notes provided by the Debtor give the formula for determining the variable interest rate but do not indicate what the interest rate was at any given point during the repayment period. Currently, Discover advertises variable interest rates ranging from 6.37% to 16.62%, although those rates may have been different at the time

Debtor recalls his payments nearly doubling. He recalls paying as much as he could but was unable make full monthly payments and quickly fell behind. He recalls reaching out to Discover to discuss forbearance or deferment options at that time, but claims they were not able to offer him a solution. He explored consolidation and refinance options but did not find a favorable solution because he was told his debt to income ratio was too high.

It is not clear from the record where the Debtor was working from the time of his graduation in May 2013 through 2016. In 2016 and 2017, the Debtor worked as an operations assistant in the shipping and receiving department of a Guitar Center store. He was also working part-time as an entertainment and lighting technician at Mohegan Sun, a Connecticut casino, where he would assist with setting up concerts and events in their arena and in the Wolf Den concert area on the casino floor. In 2018, he left Guitar Center and switched to full-time employment at Mohegan Sun, keeping his position as a lighting technician. He remains employed full-time at Mohegan Sun in the same position. His current job as a lighting technician does not relate to his music degree from Berklee. He believes that this job is a niche job that does not have any strong promise of transferability to a career path related to his chosen field or a higher paying role.

### 2. The Debtor's Schedule I Income and Schedule J Expenses

During the six years the Debtor has worked at Mohegan Sun, his income has not increased much more than 3% to 4% each year. From 2016 through 2022, the Debtor received the following income from his employment with either Guitar Center or Mohegan Sun:

---

Debtor signed his promissory notes. *See* Discover.com, Undergraduate Student Loans, https://www.discover.com/student-loans/undergraduate.html (last visited July 5, 2023).

| Year | Employer | Adjusted Gross Income | Source |
|------|----------|----------------------|--------|
| 2016 | Guitar Center | $36,312 | IRS 1040A, ECF No. 45-4, p. 2 |
| 2017 | Guitar Center | $38,243 | IRS 1040A, ECF No. 45-4, p. 4 |
| 2018 | Mohegan Sun | $46,079 | IRS 1040, ECF No. 45-4, p. 6 |
| 2019 | Mohegan Sun | $48,419 | IRS 1040, ECF No. 45-4, p. 7 |
| 2020 | Mohegan Sun | $48,561 | IRS 1040, ECF No. 45-4, p. 9 |
| 2021 | Mohegan Sun | $55,098 | IRS 1040, ECF No. 45-4, p. 11 |
| 2022 | Mohegan Sun | $52,961 | IRS 1040, ECF No. 45-4, p.13 |

Debtor's List of Exhibits, AP-ECF No. 45-4. The increase in the Debtor's income from 2018 through 2021 was due to the Debtor's transition to full-time employment at Mohegan Sun. In 2021, after the onset of the COVID-19 pandemic, the Debtor was furloughed by Mohegan Sun but qualified for Connecticut's COVID-related unemployment program to supplement his income. He worked twenty-five hours per week during this time but collected unemployment benefits for the remaining fifteen hours per week. He returned to full-time employment status in 2022 and received a 4% raise that year.

The Debtor does not see his income at Mohegan Sun improving much in the future, as he claims that the Mohegan Tribe members get preferred consideration for any promotions. He testified that a 5% raise was a rarity at Mohegan Sun. The Debtor has made some effort to seek other jobs with a higher rate of pay, but claims that he is not stable enough financially to move out of state. Within Connecticut, the closest jobs that would relate to his music degree are at places such as WFSB in Stamford or another TV news station. He has not applied to any of those jobs, however. He has thought about teaching music, but believes he needs a master's degree to do so. He used to be a member of a local band, but has only played three or four times in the last year or so. He has looked at jobs with the Connecticut Department of Education, a Tesla dealership location in Meriden, Connecticut, as well as Rosco, a Stamford company that makes lighting equipment and other products used for movie sets. He claims there are no current

openings at Rosco, but he continues to look for employment there. The Debtor has also explored

working in a restaurant setting. He used to work at Pepe's, a pizzeria at Mohegan Sun, but claims

that he was overlooked for a management position there because he was unable to start the

position right away.

Presently, the Debtor is a healthy, thirty-two year old single male with no dependents. He

lives by himself and has never been married. Although he lives modestly, his budget results in a

surplus each month. The Debtor's Schedule I monthly income after tax and withholding

deductions is $3,265.05 and his Schedule J monthly expenses are $2,670.23, leaving a monthly

surplus of $594.82. The Debtor orally amended his Schedule J during the hearing after he

clarified that some expenses had been overstated and some had increased. These adjustments

brought his Schedule J expenses down to $2,578.40. With these adjustments, the Debtor has a

monthly surplus in his budget of $686.65. The Debtor's total monthly expenses are as follows:

| | |
|---|---|
| Rent | $850 |
| Electricity, heat, natural gas | $200 |
| Internet and streaming services | $122 |
| Food and housekeeping supplies | $200 |
| Clothing, laundry, and dry cleaning | $25 |
| Personal care products and services | $20 |
| Transportation, including gas, maintenance, but or train fair | $150 |
| Entertainment, clubs, recreation, newspapers, magazines, and books | $250 |
| Vehicle insurance | $212 |
| Tenant's insurance | $35.16 |
| Vehicle property tax | $35 |
| Car payment | $312.30 |
| Federal student loans | $166.94 |

| Total Expenses | $2,578.40 |
|----------------|-----------|

The Debtor's largest monthly expense is the $850 monthly rental payment for the double-wide trailer where he lives. He makes a monthly car payment of $312.30 on a 2020 Jeep Renegade, which he purchased new in 2021 after making an $8,000 down payment. His prior vehicle, a 2011 Mazda, was fully paid off but needed substantial repairs so his father took the Mazda to use as a second vehicle. When searching for a new car in 2021 during the COVID-19 pandemic, the Debtor found that used car prices were very high. He claims that the Jeep was an affordable option because it was last year's model and was the last one available at the dealership. He recalls the purchase price for that vehicle being approximately $18,000. The Debtor estimates his monthly entertainment expenses at $250. He clarified that this number has gone down because he avoids eating out as much, but did not specify a current number for this type of expense. Since he filed his Petition, his car insurance payments have increased from approximately $140 per month to $212 per month. He also has periodic payments for certain necessities, such as the $300 he recently paid for contact lenses.

To reduce these expenses, the Debtor has considered moving in with his parents but decided against it because they do not have enough space for him. Although his mother is a co-signer on the Discover Loans, he does not believe that she can afford to help him pay those loans. His mother is approximately 60 years old and works as a billing director at UConn Health, a medical facility associated with the University of Connecticut's School of Medicine. His father is 60 years old and will retire soon.

The purpose of the Debtor's bankruptcy petition was to address the Discover Loans, as the Debtor otherwise has a very small amount of unsecured debt. As of the Petition Date, the Debtor owed $146,330.63 in federal and private student loans combined. The Debtor's only

secured debt arises from the financing agreement he signed for his Jeep. His remaining

unsecured debt, aside from student loans, amounts to less than $3,000.

### 3. Discover's Collections Lawsuit

In 2021, Discover served a collections lawsuit on the Debtor related to the Discover

Loans (the "Collections Lawsuit"). The summons is dated June 14, 2021. Discover did not return

the Complaint to the Connecticut Superior Court, and thus the case does not have a docket

number assigned to it. In the Complaint, Discover alleges that the Debtor failed to make timely

payments on the Discover Loans and that it had demanded payment from the Debtor, but had not

received satisfaction of the outstanding debt. Discover alleges that the loans had a current

balance at that time of $127,910.26. Discover further alleges that the Debtor made his last

payment on the Discover Loans on March 20, 2019 in the amount of $742.82. The Debtor

confirmed that these allegations were correct.

The Debtor claims that he never received a demand letter from Discover requesting

payment in full of the Discover Loans. However, Discover's Student Loan Recovery Department

sent a letter dated January 19, 2022 to the Debtor's bankruptcy counsel, Eugene S. Melchionne,

requesting that the Debtor contact Discover to discuss repayment options after the Discover

Loans were not discharged in the Debtor's Chapter 7 case. The Debtor does not recall whether he

or Attorney Melchionne spoke with Discover after receiving the letter.

## III.   DISCUSSION

### A.  Default Judgment Standard

Federal Rule of Civil Procedure 55(b), made applicable to this Adversary Proceeding by

Federal Rule of Bankruptcy Procedure 7055, provides a two-step process for entry of judgment

against a party who fails to defend: (1) entry of a default, which is performed by the clerk of

court, and (2) entry of a judgment, which is entered by either the court or the clerk, depending on the circumstances. "The first step, entry of a default, formalizes a judicial recognition that a defendant has, through its failure to defend the action, admitted liability to the plaintiff." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 128 (2d Cir. 2011); Fed. R. Civ. P. 55(a). "The second step, entry of default judgment, converts the defendant's admission of liability into a final judgment that terminates the litigation and awards the plaintiff any relief to which the court decides it is entitled, to the extent permitted by Rule 54(c)." *Mickalis*, 645 F.3d at 128.

Once an entry of default has entered, there are two ways in which a default judgment may subsequently enter. First, under Rule 55(b)(1), upon request of the plaintiff, the clerk may enter a judgment by default when the claim is "for a sum certain or a sum that can be made by certain computation." Fed. R. Civ. P. 55(b). In all other cases, the party must apply to the court for a default judgment under Rule 55(b)(2), at which time:

> The court may conduct hearings or make referrals—preserving any federal statutory right to a jury trial—when, to enter or effectuate a judgment, it needs to:
>
> (A)    conduct an accounting;
> (B)    determine the amount of damages;
> (C)    establish the truth of any allegation by evidence; or
> (D)    investigate any other matter.

Fed. R. Civ. P. 55(b)(2); *see also Mickalis*, 645 F.3d at 129 ("A district court is empowered under Rule 55(b)(2), in the exercise of its discretion, to 'conduct hearings or make referrals' as may be necessary, *inter alia*, to determine the amount of damages or establish the truth of the plaintiff's allegations."); *Double Green Produce, Inc. v. F. Supermarket Inc.*, 387 F. Supp. 3d 260, 265 (E.D.N.Y. 2019) ("The decision to grant a motion for default judgment is left to the sound discretion of the district court."); *Mens Sportswear, Inc. v. Sasson Jeans, Inc. (In re Men's*

*Sportswear, Inc.)*, 834 F.2d 1134, 1137 (2d Cir. 1987) (bankruptcy courts have jurisdiction to enter default judgments in core proceedings).

Rule 55(b)(2) bestows a gatekeeping function on federal courts to ensure that a default judgment is warranted. "[A]lthough the entry of a default results in all well-pleaded factual allegations in the complaint being accepted as true, the Court must nevertheless determine whether the complaint states a claim upon which relief may be granted" before issuing a default judgment. *Scottsdale Ins. Co. v. Priscilla Properties, LLC*, 254 F. Supp. 3d 476, 484 (E.D.N.Y. 2017) (citing *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65–66 (2d Cir. 1981)). In general, "a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717 (2d Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (alteration in original) (quoting *Iqbal*, 556 U.S. at 678).

Discover remains absent, despite ostensibly proper service of the Complaint and the Debtor's Request for Default Judgment. Notwithstanding the nonappearance of Discover, the Court has an independent gatekeeping responsibility to assess the merits of the Debtor's claim and adjudge the appropriateness of the relief requested in the Complaint. It is not charged, however, with rebutting the Debtor's unopposed evidence. The Court will therefore proceed with applying the *Brunner* test to the facts and circumstances presented in the Debtor's case.

### B.  The *Brunner* Test

"Student loans are presumptively nondischargeable in bankruptcy." *Easterling v. Collecto, Inc.*, 692 F.3d 229, 231 (2d Cir. 2012). Under Section 523(a)(8) of the Bankruptcy Code, however, student loan debt is dischargeable if "excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). The Bankruptcy Code does not define "undue hardship," but the Second Circuit defined a three-prong test in *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987) for determining its existence. To defeat the statutory presumption against student loan discharge, the debtor must plead, and ultimately show by a preponderance of the evidence, the following facts:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;

> (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

> (3) that the debtor has made good faith efforts to repay the loans.

*In re Tingling*, 990 F.3d 304, 309 (2d Cir. 2021), *cert. denied sub nom. Tingling v. Educ. Credit Mgmt. Corp.*, 142 S. Ct. 1367 (2022) (quoting *Brunner*, 831 F.2d at 396).

#### 1.  Minimal Standard of Living

The first prong of the *Brunner* test requires the plaintiff to show that he cannot maintain a minimal standard of living for himself and his dependents if forced to repay the loans. *Brunner*, 831 F.2d at 396. "This minimal standard of living test 'requires more than a showing of tight finances' . . . and is not met 'merely because repayment of the borrowed funds would require some major personal and financial sacrifices.'" *Elmore v. Mass. Higher Educ. Assistance Corp. (In re Elmore)*, 230 B.R. 22, 26 (Bankr. D. Conn. 1999) (quoting *Pennsylvania Higher*

14

*Education Assistance Agency v. Faish*, 72 F.3d 298, 306 (3rd Cir.1995)); *see also Lozada v. Educ. Credit Mgmt Corp. (In re Lozada)*, 594 B.R. 212, 222 (Bankr. S.D.N.Y. 2018), *aff'd*, 604 B.R. 427 (S.D.N.Y. 2019). "On the other hand, the test does not require a debtor to demonstrate that repayment of the loan would cause him and his family to live at or below the poverty level." *Elmore*, 230 B.R. at 26. "While it is not the Court's role to impose, *ad hoc*, a certain standard of living on the debtor, or to author his budget, the Court is required to 'review the reasonableness of the Debtor's budget—particularly the allocation of projected expenses in relation to projected income as it determines his capabilities to pay the instant obligations without undue hardship.'" *Lozada*, 594 B.R. at 222 (quoting *Pincus v. Graduate Loan Center (In re Pincus)*, 280 B.R. 303, 317 (Bankr. S.D.N.Y. 2002)).

"When applying this prong of the *Brunner* test, courts focus on a debtor's household income and expenses to determine what expenses are necessary for the debtor to meet her basic needs, such as food, shelter, clothing, transportation and medical treatment for herself and any dependents before repaying student loan debt." *In re Hlady*, 616 B.R. 257, 271 (Bankr. E.D.N.Y. 2020). "Additionally, courts consider whether a debtor has sought to maximize her ability to earn adequate income to pay for expenses and student loans while minimizing certain discretionary expenses." *Id.*; *see also Pincus*, 280 B.R. at 318 (finding debtor failed to demonstrate inability to maintain a minimal standard of living where debtor lived a comfortable lifestyle that was above debtor's means, such as paying for gym membership when a free gym was available at work, eating out and paying for newspapers, and did not evince efforts to minimize certain discretionary expenses). "A minimally necessary standard of living means living 'within the strictures of a frugal budget in the foreseeable future' . . . . Minimum standard of living does not mean mechanical adherence to the federal poverty guidelines, but the fact that a debtor's income

falls below the poverty guidelines does provide strong support that the debtor's standard of living is minimal." *Hlady*, 616 B.R. at 271 (citations omitted) (quoting *Chance v. United States of America (In re Chance)*, 600 B.R. 51, 58 (Bankr. S.D. Ind. 2019)).

At first glance, the Debtor does not fit the dire profile of a debtor who is unable to maintain a minimal standard of living while repaying his student loans. The Debtor is a healthy, thirty-two year old single male with no dependents and a long life ahead of him. Although he lives modestly, his budget leaves him with a surplus of $686 each month. His current annual gross income of $52,961 is likely to improve over the Debtor's lifetime as he gains additional skills and experience.

The Debtor's prepetition purchase of his Jeep with a financing agreement was most likely improvident at the time. The Debtor did not explain exactly what repairs his prior vehicle needed, but the Court is satisfied that the Debtor needed a more reliable vehicle. His monthly car payment of $312.30 is not excessive, but this monthly payment is only this low because the Debtor's $8,000 down payment reduced the remaining principal amount owed under his financing agreement. The Court finds the Debtor's testimony—that used car prices were high at the time—to be generally credible, but not entirely persuasive. Although used car prices were generally higher than average at certain times during the COVID-19 pandemic, the Debtor more likely than not could have found a cheaper (but equally reliable) vehicle that did not involve a large, cash down payment *and* a significant monthly payment lasting years into the future. Under this prong of the *Brunner* test, however, the purchase of a vehicle at a time when a debtor otherwise lacks reliable transportation is generally found to be a reasonable expense necessary to maintain a minimal standard of living. *See e.g., Jorgensen v. Jorgensen (In re Jorgensen)*, 479 B.R. 79, 87 (B.A.P. 9th Cir. 2012) (debtor was not required to reduce her car expenses after

debtor purchased new vehicle financed at a rate of $362.73 per month over five years because her prior vehicle needed significant repairs and she purchased an inexpensive subcompact vehicle with a warranty). The Court, therefore, will not require the Debtor to reduce this expense.

The record is not entirely clear about what the Debtor's monthly $250 entertainment expense consists of. The Debtor's claim that he reduced his entertainment expenses by eating out less does not explain by how much he reduced this expense. Even under the minimal standard of living test, however, the Debtor is entitled to a modest amount of recreation and entertainment expenses. *See, e.g., In re Haugen*, 645 B.R. 635, 651 (Bankr. D.N.D. 2022) (debtor's miscellaneous expenses of $358 was likely reasonable if it included costs for the benefit of the debtor's minor child such as viola rental fees, other school-related expenses, and entertainment costs like trips to the zoo and restaurants); *In re Clavell*, 611 B.R. 504, 517 (Bankr. S.D.N.Y. 2020) ("[A]" debtor is not required under *Brunner* to forego necessary and reasonable expenses, such as healthcare expenses, food, and a modest amount of recreation and entertainment that is incident to modern life."). The Court will not require the Debtor to further reduce this expense, particularly in light of the absence of rebuttal from Discover in this case.

Importantly, Discover has accelerated both Discover Loans and "charged off" or written off the loans as a loss and closed the accounts to future charges. If the Discover Loans are not discharged, Discover or its assigns can, and likely will, proceed with the Collections Lawsuit and seek garnishment of the Debtor's wages until the Discover Loans are fully paid. Connecticut wage garnishment law limits the amount of wage garnishment to 25% of a debtor's weekly disposable earnings. *See* Conn. Gen. Stat. § 52-361a. Based on the Debtor's net monthly income of $3,265.05, Discover would be entitled to garnish approximately $816 per month of the Debtor's wages. Currently, the Debtor's budget cannot support a garnishment by Discover while

simultaneously allowing him to maintain a minimal standard of living. The wage garnishment would consume any surplus in the Debtor's budget and leave him with a negative monthly income. It would also risk the Debtor defaulting on his federal student loan when it enters repayment status in September.

The Court has located at least one recent decision that addressed this same issue, although there do not appear to be any others addressing private student loans and wage garnishment in this context. In *Nitcher v. Education Credit Management Corp.*, the debtor had defaulted on private student loans that were fully accelerated with a charge-off balance of $51,821.62. *Nitcher v. Educ. Credit Mgmt. Corp. (In re Nitcher)*, 606 B.R. 67, 73 (Bankr. D. Or. 2019). As a licensed attorney, the debtor had a slightly higher monthly income of $3,739 that was subject to a 25% wage garnishment by the student loan lender. *Id.* at 76. The lender argued that any repayment concessions or other restructuring agreement with the debtor would be subject to the lender's unilateral discretion because the loans were private student loans. *Id.* The bankruptcy court held that the debtor met the first prong of the *Brunner* test based on the accelerated, charged-off status of the loans, the risk of wage garnishment, and the fact that the debtor's budget resulted in a monthly negative income of $479. *Id.* 75–76.

Although the Debtor has positive monthly income, he remains responsible for at least $127,910.26 in private student loans that have been accelerated and cloud his future prospects for employment and financial stability. The Debtor cannot pay the full amount due in a single payment under any circumstances. He has no assets that could satisfy this amount, other than his vehicle that he needs for commuting to work. If Discover proceeds with the Collections Lawsuit and garnishes the Debtor's wages, the Debtor will have negative monthly income.[10] Without

---

[10] Under the Revised Pay As You Earn Repayment Plan (REPAYE) offered to student borrowers by the Department of Education on federal Direct Loans, which calculates payments based on your family size and income, borrowers

willingness or offer of a program by Discover to restructure the Discover Loans and allow the Debtor to continue making payments within his means, there is no current path forward where the Debtor can maintain a minimal standard of living. A wage garnishment would significantly reduce any incentive to earn a raise at his current job, as any increase in income would proportionally increase the amount of the wage garnishment. Accordingly, the Court is satisfied that the Debtor has met the first prong of the *Brunner* test.

### 2. Additional Circumstances Indicating the State of Affairs Will Likely Persist During the Repayment Period

The second prong of the *Brunner* test requires that the plaintiff demonstrate that additional circumstances indicate the Debtor's state of affairs will likely persist during a significant portion of the repayment period. *Brunner*, 831 F.2d at 396. "Unlike the first prong of the test—which focuses on the present—this step looks to the future and 'takes into account the nature of education as a long term investment that may not pay dividends for years to come.'" *Rosenberg v. Educ. Credit Mgmt. Corp.*, No. 20-CV-00688 (PMH), 2021 WL 4461341, at *11 (S.D.N.Y. Sept. 29, 2021) (quoting *In re Stern*, 288 B.R. 36, 42 (Bankr. N.D.N.Y. 2002)).

This prong of the test implicates two important questions: (1) whether the repayment period ends upon default and acceleration or upon expiration of the contractual repayment period, and (2) whether acceleration of the Discover Loans and the risk of a wage garnishment constitutes an "additional circumstance" indicating the Debtor's state of affairs will likely persist during the repayment period.

As to the first question, *Brunner* requires the Court to determine if the Debtor will remain at the margins of a minimal standard of living "for a significant portion of the repayment

---

do not pay more than 10% of their disposable income. Department of Education, Federal Student Aid Repayment Plans, https://studentaid.gov/manage-loans/repayment/plans (last visited on June 29, 2023).

period." *Brunner*, 831 F.2d at 396. This question presents some difficulty. Very little case law exists addressing the end of the repayment period in a case involving accelerated or charged off student loans. Only three of the cases reviewed by the Court confront this issue, and only one of those cases involves private student loans.

In *Rosenberg v. Education Credit Management Corp. (In re Rosenberg)*, Chief Judge Morris found that the debtor's repayment period ended when his federal student loans were accelerated after default and thus were due and payable in the full amount. 610 B.R. 454, 461 (Bankr. S.D.N.Y. 2020), *leave to appeal granted Rosenberg v. Educ. Credit Mgmt. Corp.*, No. 20-CV-688 (CS), 2020 WL 1048599 (S.D.N.Y. Mar. 4, 2020), *and aff'd in part, rev'd in part and remanded Rosenberg v. Educ. Credit Mgmt. Corp.*, No. 20-CV-00688 (PMH), 2021 WL 4461341 (S.D.N.Y. Sept. 29, 2021). On that basis, Chief Judge Morris determined that the debtor had met the second prong of *Brunner* as a matter of law because, naturally, his additional circumstances certainly would exist for the remainder of the repayment period if the repayment period had expired.[11] *Id.*

---

[11] On appeal, the district court found that the debtor had failed to satisfy the second prong of *Brunner* because he could not show that his alleged physical injuries had impeded his ability to work and improve his financial condition. *Rosenberg*, 2021 WL 4461341 at *12. In a footnote, the district court reasoned that even if the debtor's loan was accelerated—a fact that the debtor had also failed to prove—the debtor could rehabilitate his defaulted federal student loans under 34 C.F.R. § 682.405, which allows the debtor to enter a ten-month repayment plan where the payments are determined based on the debtor's family size and income in comparison to the federal poverty guideline. *Id.* at *11 n.20. The district court also noted that "when a debtor defaults on a student loan provided by the government, the fact that the outstanding balance is more than the debtor could pay in a single payment" cannot satisfy the first prong of the *Brunner* test because it would "subvert the presumption against discharge embodied in 11 U.S.C. § 523(a)(8)." *See id.* The district court did not address the bankruptcy court's determination that the acceleration ended the repayment period, as the decision rested on the debtor's failure to prove that his medical issues constituted "additional circumstances" that resulted in undue hardship.

*Rosenberg* highlights one of the critical differences between federal and private student loans: a borrower has the ability to restructure federal student loans after default and acceleration, but generally does not have that option with private student loans, which are due in full once accelerated unless the lender voluntarily agrees to restructure the loan. Thus, a debtor will always have more flexibility to repay federal student loans after default and acceleration than with private student loans.

In *Nitcher*, the bankruptcy court determined that the length of the repayment period for accelerated student loans under prong two is determined by the contract terms of the debtor's note, which resulted in a repayment period of zero for two out of three of the debtor's loans. *Nitcher*, 606 B.R. at 78. *Nitcher* is the only case this Court reviewed addressing a repayment period for private student loans. Judge McKittrick relied on in-depth analysis provided by Judge Frank in *Price v. DeVos (In re Price)*, 573 B.R. 579 (Bankr. E.D. Pa. 2017), *rev'd sub nom. DeVos v. Price*, 583 B.R. 850 (E.D. Pa. 2018), a case where the contractual repayment period had not yet expired. The *Price* court determined that the repayment period is the remaining term of the contract in cases where a debtor chose in good faith not to enter an extended repayment program. Judge McKittrick cautioned against injecting the good faith analysis into the second prong, however, as it introduces too much speculation and uncertainty into an already difficult forward-looking analysis.

In *Wolfson v. Devos (In re Wolfson)*, Judge Silverstein agreed with the analysis of Chief Judge Morris and Judge McKittrick and found that the repayment period on the debtor's federal student loans had ended either when the contractual ten-year repayment period had expired or upon default when the loans were accelerated.  No. 19-11618 (LSS), 2022 WL 5055468, at *8 (Bankr. D. Del. Jan. 14, 2022). Judge Silverstein did not need to determine whether acceleration would end the repayment period alone because the contractual repayment period had already expired.

*Rosenberg, Nitcher,* and *Wolfson* reflect an objective standard for determining the repayment period. The Court joins with these judges and their sound reasoning in applying the second prong of *Brunner*.

This case involves accelerated student loans with a contractual repayment period that would not otherwise expire for several years. Under the contractual terms of the Discover Loans, each loan has a repayment period of 180 months (or fifteen years) that begins when payments commence at the end of the six-month grace period following graduation. The Debtor graduated from Berklee around May 2013 and thus his repayment period for both Discover Loans began in November 2013 after his grace period had expired.[12] Thus, but for the acceleration, the Debtor's repayment period for both loans would end in November 2028, approximately five years from now. Yet again, however, Discover's non-response to the Amended Complaint eliminates a rigorous vetting of this issue by the Court.

As to the second question, *Brunner* requires that a debtor show "additional, exceptional circumstances" that are "strongly suggestive of a continuing inability to repay over an extended period of time," as those types of circumstances "more reliably guarantee[] that the hardship presented is 'undue.'" *Brunner*, 831 F.2d at 396. The Bankruptcy Appellate Panel of the Ninth Circuit Court of Appeals has identified a persuasive and nonexhaustive list of "additional circumstances" under the second prong of *Brunner*, which includes the following:

[ (1) ] Serious mental or physical disability of the debtor or the debtor's dependents which prevents employment or advancement; [ (2) ] The debtor's obligation to care for dependents: [ (3) ] Lack of, or severely limited education; [ (4) ] Poor quality of education; [ (5) ] Lack of usable or marketable job skills; [ (6) ] Underemployment; [ (7) ] Maximized income potential in the chosen educational field, and no other more lucrative job skills; [ (8) ] Limited number of years remaining in [the debtor's] work life to allow payment of the loan; [ (9) ] Age or other factors that prevent retraining or relocation as a means for payment of the loan; [ (10) ] Lack of assets, whether or not exempt, which could be used to pay the loan; [ (11) ] Potentially increasing expenses that outweigh any potential appreciation in the value of the debtor's assets and/or likely increases in the debtor's income; [ (12) ] Lack of better financial options elsewhere.

---

[12] Without the Debtor's exact date of graduation, the Court cannot determine the precise day in November 2028 on which the repayment period ends.

*In re Nys*, 308 B.R. 436, 446 (B.A.P. 9th Cir. 2004), *aff'd*, 446 F.3d 938 (9th Cir. 2006); *see also*
*In re Traversa*, 444 F. App'x 472, 475 (2d Cir. 2011) (debtor failed to carry his burden to prove
that his alleged medical conditions would render him unable to repay his loans over an extended
period of time); *In re Porrazzo*, 307 B.R. 345, 351 (Bankr. D. Conn. 2004) (debtor diagnosed
with Asperger's Syndrome who lived solely off disability benefits and was unable to find or
maintain a job due to his disability satisfied second prong of *Brunner* test).

The Debtor testified that he has no dependents and is generally in good health; has an
undergraduate degree; has marketable job skills and is capable of learning new skills; is fully
employed; and has many years of gainful employment ahead. The Debtor graduated from college
just ten years ago and is still in the early stages of his professional career. His music degree
regrettably has not provided him with the job opportunities he hoped to find, but his income has
incrementally increased each year since at least 2016. His current job at Mohegan Sun will likely
not provide anything more than small incremental increases in his income in the future, but he
testified that there were several companies in Connecticut where he could likely find a job
related to his chosen field with the potential for higher pay. There is nothing in the record
indicating the Debtor is unemployable in other areas outside his chosen field or is incapable of
learning new skills or acquiring on-the-job training if he found another job outside his field that
paid more than his current position. He persuasively testified, however, that he was financially
unable to relocate to New York or California where his income might improve, but the higher
cost of living in those areas would risk negating any increased income.

Based on these facts alone, the Debtor would not meet this prong of the *Brunner* test.
However, the acceleration of private student loans and the threat of a wage garnishment present
unique problems in a student loan discharge case. Unlike federal student loans, which allow

borrowers to rehabilitate their loans after acceleration, *see* 34 C.F.R. § 682.405, private student loans offer no loss mitigation or rehabilitation options after acceleration. The borrower remains on the hook for the entire charged-off balance of the loan, unless the lender voluntarily agrees to restructure the loan or the borrower somehow manages to pay off the loan in full. If Discover garnishes the Debtor's wages, the Debtor will forfeit 25% of his monthly income for at least the next thirteen years.[13] The Debtor will be forty-five years old by then. Any time the Debtor receives a raise, the garnishment will proportionately increase with his income, thereby substantially eliminating any benefit from the additional income and creating disincentive for the Debtor to earn a higher wage. In other words, the wage garnishment would financially imprison the Debtor for well over a decade.

The automatic stay imposed by the Debtor's bankruptcy filing has heretofore prevented Discover from returning the complaint in the Collections Lawsuit to state court and obtaining a wage garnishment. If the Discover Loans are not discharged in this Adversary Proceeding, it is likely that Discover will pursue its legal rights. Thus, the Debtor's circumstances are "strongly suggestive of a continuing inability to repay over an extended period of time," *Brunner*, 831 F.2d at 396. For these reasons, and in the absence of rebuttal by Discover, the Court finds that the Debtor has sufficiently satisfied the second prong of the *Brunner* test.

### 3.  Good Faith Efforts to Repay

The third prong of the *Brunner* test requires that the plaintiff demonstrate that he made a good-faith effort to repay his student loans. *Brunner*, 831 F.2d at 396. "A finding of good faith 'turns on several considerations, including the debtor's efforts to obtain employment, maximize

---

[13] To pay off $127,910.26 in student loans at $816 per month, assuming no interest accrues, would take approximately 156 months or about thirteen years. This is a loose approximation of how long it would take the Debtor to pay off the Discover Loans under a wage garnishment.

his income, minimize his expenses, and participate in alternative repayment options.'" *Lozada*,
594 B.R. at 227 (quoting *In re Norasteh*, 311 B.R. 671, 676 (Bankr. S.D.N.Y. 2004)). In
addition, "[g]ood faith may be found where a debtor has consistently made at least some
payments on the student loans in the past, has sought consolidation or forbearance, has made
other efforts to increase affordability of the loan payments or has offered to compromise or settle
the obligation in a meaningful manner." *Davis v. Conduent (In re Davis)*, 608 B.R. 693, 707
(Bankr. N.D. Ill. 2019).

The Debtor made his last payment on the Discover Loans on March 20, 2019. Around
that time, he contacted Discover and they assisted him with temporary forbearance or deferment
for a few months but those protections eventually ceased. He claims Discover was unable to
further work with him to negotiate a repayment plan. At some unidentified point in time, he
attempted to consolidate or refinance the Discover Loans but was unsuccessful in that regard
because his debt to income ratio was too high. The Court finds the Debtor to be generally
credible on this issue. The record, however, contains no documentary evidence of the Debtor's
payment history or attempts at consolidation and refinancing.

Discover sent a January 19, 2022 letter requesting the Debtor contact Discover to discuss
repayment options after the Discover Loans were not discharged in the Debtor's Chapter 7 case.
The Debtor argues that the Court should disregard the letter because Discover sent it *after* it
served the Collections Lawsuit on the Debtor. Because the Debtor does not recall whether he or
his bankruptcy attorney reached out to Discover to discuss repayment options at this time, it is
difficult for the Court to determine whether this weighs against the Debtor's good faith efforts to
repay his loans. This is yet another complication created by Discover's absence in this case.

Accordingly, the Court will favorably credit the Debtor's alleged good faith efforts to repay the Discover Loans.

The Debtor's biggest problem with this prong of the *Brunner* test is that he arguably has not made "adequate efforts" to maximize his income. The Court is sensitive to the unfortunate reality the Debtor is presently faced with and his restraints on mobility and advancement in his creative field. Borrowing the full cost of attendance for a music degree, even a degree from an allegedly top-tier conservatory such as Berklee, can be a risky financial decision because there is no guarantee whatsoever that the degree will lead to significant job prospects after graduation with income sufficient to satisfy such a large student loan debt obligation. Students from lower and middle class families who borrow large amounts of money to attend this type of school are often left facing significant financial hurdles after graduation that can long derail their life. The Debtor is not unique in this regard; thousands of other students find themselves in this situation every day. As the Debtor noted, several of his peers were not able to find well-paying jobs in their chosen field. The Court suspects that this may be a somewhat common occurrence for students graduating from degree programs in the creative arts, particularly when a successful career as an artist or musician could take many years to develop. This issue is more reflective of a systemic issue in the broader college education system that is not easily solved under the parameters of the *Brunner* test.

Repaying substantial student loan debt when a debtor's chosen degree does not result in a reasonably well-paying job after graduation requires a fair amount of tenacity and grit. The Debtor testified that he was aware of several local companies where he might find a higher paying job in his field, but the record contains no evidence that he ever submitted a job application to any of those companies or reached out to them and expressed interest in working

26

there. The Court recognizes that finding higher paying work can depend on a variety of factors such as one's marketable skills, location, or the state of the economy, but the Debtor has had ten years to search for a better job. Other than the one restaurant management position the Debtor could not accept because he could not start right away, the record contains scant evidence that the Debtor applied for or was considered for employment opportunities beyond Guitar Center and Mohegan Sun.

If finding a higher paying job is not an immediate option, taking on part-time work or a side gig to supplement less-than-adequate full-time income is often a necessity, particularly for young and middle-aged debtors with no dependents. There is no guarantee that working 40 hours per week will be sufficient to meet a significant debt obligation such as the one in this case. The Debtor argued that his current job schedule is unpredictable because it depends on the events or concerts that are scheduled at Mohegan Sun, which makes it impossible for the Debtor to take on a second job when he does not know what hours he can work. In our modern world, however, there is no shortage of part-time work available. Technology and the gig economy provide endless opportunities for people to supplement their income in accordance with the limitations of their schedule, even in rural areas.

It is not the Court's function or responsibility to relieve the Debtor from the consequences of his own choices. The *Brunner* test guards against this temptation. Although the Debtor made consistent payments on the Discover Loans for several years, he has not made significant efforts to maximize his income. But for Discover's nonrebuttal, the Debtor likely would not meet this prong of the *Brunner* test. In light of Discover's nonappearance and failure to respond or defend itself in this case, however, the Court finds that the Debtor has

demonstrated sufficient, though minimal, good faith efforts to repay the Discover Loans and thus, for purposes of a partial discharge, the Debtor has met this prong of the *Brunner* test.

### C. Partial Discharge

The Court is now faced with the question of whether to discharge all or part of the Discover Loans. The Debtor requests that the full amount of the Discover Loans be rendered dischargeable. Bankruptcy courts in the Second Circuit are divided as to whether the Bankruptcy Code permits partial discharge of a student loan. *See, e.g., In re Homaidan*, 646 B.R. 550, 593 (Bankr. E.D.N.Y. 2022) (Bankruptcy Code does not allow for partial discharge of student loan debt); *In re Clavell*, 611 B.R. 504, 532 (Bankr. S.D.N.Y. 2020) (allowing partial discharge because parties agreed that court had power to grant partial discharge, but refraining from fully deciding the issue); *In re Pincus*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002) (neither Section 523(a)(8) nor Section 105 of the Bankruptcy Code allow a partial discharge). There is no binding authority from the Second Circuit Court of Appeals on this issue. This Court is persuaded by these decisions and the lack of a statutory prohibition on partial discharge such that it may properly accord measured relief under these circumstances.

The Debtor has sufficiently met all three prongs of the *Brunner* test and established undue hardship as to the fully accelerated balance of the Discover Loans in light of Discover's failed responsiveness to the Debtor's modest efforts to explore a consensual income-based restructuring. The full satisfaction of the accelerated Discover Loans is not feasible in the short or intermediate term without significant financial hardship that would severely threaten the Debtor's future job prospects and income growth, as well as his ability to live independently, while maintaining a minimal standard of living. The Debtor is therefore entitled to a partial discharge of the Discover Loans.

## IV.    CONCLUSION

Accordingly, on the basis of the record, the Court grants the Debtor a full discharge of Loan 1 in the amount of $62,576.15. As for Loan 2, which has a current charged off balance of $65,334.11, the Court grants the Debtor a partial discharge of this loan in the amount of $33,834.11. This leaves the Debtor with a total remaining balance of $31,500 for Loan 2. Based on the Debtor's current income and expenses under his Schedule I and J, the Court finds that the Debtor can pay $500 per month towards the remaining balance of Loan 2. His payments will commence on August 1, 2023 and last for the remainder of the repayment period through November 1, 2028. The balance of Loan 2 will not accrue interest during the remaining repayment period unless the Debtor defaults again. The Debtor's obligation to a variable interest rate for Loan 2 is also discharged and converted to a fixed interest rate of 6.5% that applies only in the event of default.[14]

---

[14] The Court notes that this result is not entirely inconsistent with the metrics used by the Department of Education for determining income-based repayment plans for federal student loans. *See* Department of Education, Federal Student Aid Repayment Plans, https://studentaid.gov/manage-loans/repayment/plans (last visited on June 29, 2023).

In determining the default interest rate, the Court reviewed several sources of postjudgment interest rates. Under 28 U.S.C. § 1961, and based upon the current weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, the current federal postjudgment interest rate is 5.41%. 11 U.S.C. § 1961; FederalReserve.gov, Board of Governors of the Federal Reserve System, H.15 Selected Interest Rates (Daily), https://www.federalreserve.gov/releases/h15/ (last updated July 12, 2023). Under Connecticut law, Conn. Gen. Stat. §§ 37-3a and 37-3b provide that, in a civil action, the trial court may determine the appropriate postjudgment rate of interest to be awarded up to a maximum of 10% per year. In addition, the Court also reviewed the current interest rates for Federal Direct Loans for undergraduate students (5.5%) and for Federal Direct Parent PLUS Loans (8.05%). Studentaid.gov, Federal Student Aid, Interest Rates and Fees for Federal Student Loans, https://studentaid.gov/understand-aid/types/loans/interest-rates (last visited July 13, 2023). In the exercise of its discretion under Conn. Gen. Stat. §§ 37-3a and 37-3b, and in accordance with the Court's equitable powers under 11 U.S.C. § 105, the default rate as set above is generally consistent with these provisions.

**IT IS SO ADJUDGED, ORDERED AND DECREED** at Hartford, Connecticut this

13th day of July 2023.

*James J. Tancredi*
United States Bankruptcy Judge
District of Connecticut